IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

IN THE MATTER OF THE SEARCHES OF:

SAMSUNG GALAXY S22 ULTRA BEARING
SERIAL NUMBER R5CRC3X5HAE;

SAMSUNG GALAXY S21 ULTRA BEARING
SERIAL NUMBER R5CRC3X5Z5M;

AMCREST DIGITAL VIDEO RECORDER
(DVR) BEARING SERIAL NUMBER
AMR1454328C5221A37;

AMCREST DIGITAL VIDEO RECORDER
(DVR) BEARING SERIAL NUMBER
AMR1454E966934A0BD;

TOSHIBA LAPTOP COMPUTER BEARING
SERIAL NUMBER 8A413556Q;

TOSHIBA LAPTOP COMPUTER BEARING
SERIAL NUMBER 584034-001;

BLACK HP LAPTOP WITH OBLITERATED
MODEL AND SERIAL NUMBER WITH A
LABEL "GEORGIA CANNON";

SAMSUNG MODEL SPH-L900 WITH IMEI
NUMBER 99000211920997;

SAMSUNG GALAXY NOTE 8 BEARING
SERIAL NUMBER 358503087250917;

HP COMPUTER TOWER BEARING SERIAL
NUMBER 3CR2241D4B;

IN WIN COMPUTER TOWER BEARING
BARCODE 40001000209878 AND A LABEL
OF "CYBERTRONPC"; and

DIGITAL VIDEO RECORDER BEARING
SERIAL NUMBER 28429061504545,

Case No. 3:22-sw-202

*through*

Case No. 3:22-sw-213

**FILED UNDER SEAL**



Nov 18 2022

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

1

ALL CURRENTLY LOCATED AT THE
FEDERAL BUREAU OF INVESTIGATION
EVIDENCE CONTROL ROOM AT 1970 E.
PARHAM RD. RICHMOND, VA 23228.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, David Vallario, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—i.e., twelve electronic devices (collectively, "ELECTRONIC DEVICES")—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since April of 2015.  During my employment with the FBI, I have investigated numerous federal and state violations to include drug trafficking, public corruption, assaults on law enforcement officers, alien smuggling, transnational criminal organizations, gangs, money laundering, dog fighting, and interstate transportation of stolen property.  As part of my duties as a Special Agent with the Federal Bureau of Investigation, I have been able to investigate matters involving interstate transportation of stolen property.  I have participated in an investigation involving interstate transportation of stolen property, and I have received training in the investigation of interstate transportation of stolen property and related Title 18 offenses.  Through training and experience, I am familiar with the actions, traits, habits, and terminology utilized by persons involved in the criminal activities of interstate transportation of stolen property.

3.      I am familiar with the facts set forth herein based on my personal observations and information provided to me by other law enforcement personnel participating in this investigation.  I am also familiar with the facts set forth based on my review of documents, reports, interviews, photographs, and video and audio files.

4.      As the purpose of this affidavit is only to establish probable cause to support the issuance of search and seizure warrants, I have not set forth each and every fact known concerning this investigation.  Where statements of others are set forth in this affidavit, they are set forth in substance and in part.  In addition, the events described in this affidavit occurred on or about the dates provided herein.

## IDENTIFICATION OF THE ELECTRONIC DEVICES TO BE EXAMINED

5.      The ELECTRONIC DEVICES to be searched are described below.  The ELECTRONIC DEVICES are all currently located at the Federal Bureau of Investigation ("FBI") Evidence Control Room at 1970 E. Parham Rd. Richmond, VA 23228.  Law enforcement recovered the ELECTRONIC DEVICES from the following rooms of 509 Maple Street, Roanoke Rapids, North Carolina 27870 ("SUBJECT PREMISES") on November 2, 2022 pursuant to a federal search warrant issued by the United States District Court for the Eastern District of North Carolina.

| Described Further in Attachment | Device and Serial Number | Recovered from the following room of SUBJECT PREMISES |
|---|---|---|
| A-1 | SAMSUNG GALAXY S22 ULTRA BEARING SERIAL NUMBER R5CRC3X5HAE | Found on a night stand next to a bed in a room labelled "J" by the FBI. |
| A-2 | SAMSUNG GALAXY S21 ULTRA BEARING SERIAL NUMBER R5CRC3X5Z5M | Found on a night stand next to a bed in a room labelled "J" by the FBI. |

| A-3 | AMCREST DIGITAL VIDEO RECORDER (DVR) BEARING SERIAL NUMBER AMR1454328C5221A37 | Found on a bookshelf in a room labeled "N" by the FBI. |
|---|---|---|
| A-4 | AMCREST DIGITAL VIDEO RECORDER (DVR) BEARING SERIAL NUMBER AMR1454E966934A0BD | Found in a room labeled "Q" by the FBI. |
| A-5 | TOSHIBA LAPTOP COMPUTER BEARING SERIAL NUMBER 8A413556Q | Found in a room labeled "C" by the FBI. |
| A-6 | TOSHIBA LAPTOP COMPUTER BEARING SERIAL NUMBER 584034-001 | Found in a room labeled "C" by the FBI. |
| A-7 | BLACK HP LAPTOP WITH OBLITERATED MODEL AND SERIAL NUMBER WITH A LABEL "GEORGIA CANNON" | Found in a room labeled "N" by the FBI. |
| A-8 | SAMSUNG MODEL SPH-L900 WITH IMEI NUMBER 99000211920997 | Found in a bedside table drawer in room labeled "H" by the FBI |
| A-9 | SAMSUNG GALAXY NOTE 8 BEARING SERIAL NUMBER 358503087250917 | Found in the bottom drawer of a small file cabinet in a room labeled "H" by the FBI. |
| A-10 | HP COMPUTER TOWER BEARING SERIAL NUMBER 3CR2241D4B | Found on an office desk in a room labeled "H" by the FBI. |
| A-11 | IN WIN COMPUTER TOWER BEARING BARCODE 40001000209878 AND A LABEL OF "CYBERTRONPC" | Found on top of a filing cabinet in a room labeled "H" by the FBI. |
| A-12 | DIGITAL VIDEO RECORDER BEARING SERIAL NUMBER 28429061504545 | Found in a room labeled "O" by the FBI. |

6.     The applied-for warrant would authorize the forensic examination of the ELECTRONIC DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.     Based on the facts set forth in this Affidavit below, there is probable cause to believe that criminal violations of 18 U.S.C. §§ 2314 (interstate transportation of stolen property) and 371 (conspiracy to commit interstate transportation of stolen property) have been committed, are being committed, and/or will be committed by THEODORE PAPOULOGLOU and others.

There is probable cause to believe that PAPOULOGLOU'S ELECTRONIC DEVICES, all recovered by law enforcement from PAPOULOGLOU'S residence, the SUBJECT PREMISES, on November 2, 2022, contain evidence, instrumentalities, and fruits of such crimes.

8.     The ELECTRONIC DEVICES are currently in the lawful possession of the FBI. The ELECTRONIC DEVICES were recovered by law enforcement pursuant to a federal search warrant issued by the United States District Court for the Eastern District of North Carolina. *See In the Matter of the Searches of 509 Maple Street, Roanoke Rapids, North Carolina 27870 and the Person of Theodore Papouloglou*, Case No. 4:22-MJ-1172-BM (E.D.N.C. Oct. 31, 2022) ("E.D.N.C. Warrants", provided as Attachment C herein).  Therefore, while the FBI might already have all necessary authority to examine the ELECTRONIC DEVICES, I seek these additional warrants out of an abundance of caution to be certain that an examination of the ELECTRONIC DEVICES will comply with the Fourth Amendment and other applicable laws. Since the FBI took possession of the ELECTRONIC DEVICES, no examination of the ELECTRONIC DEVICES has taken place in the Eastern District of Virginia.

9.     The ELECTRONIC DEVICES are currently in storage at the FBI Evidence Control Room at 1970 E. Parham Rd. Richmond, VA 23228.  In my training and experience, I know that ELECTRONIC DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the ELECTRONIC DEVICES first came into the possession of the FBI.

*Background*

10.     Catalytic converters are a component of an automotive vehicle's exhaust device that reduces the toxic gas and pollutants from a vehicle's internal combustion engine into safe emissions

by catalyzing a redox reaction process.  Catalytic converters use precious metals in their center or "core" and are regularly targeted for theft due to the high value of these metals.  Catalytic converters are required components on all automobiles in the United States as regulated by the Environmental Protection Agency ("EPA").

11.     Thieves steal catalytic converters from vehicles for the precious metals the core contains, including palladium, platinum, and rhodium.  Some of these precious metals are more valuable per ounce than gold and their value has been increasing in recent years.  The black-market price for certain catalytic converters can be above $1,000 each.  Catalytic converters are often stolen by using handheld 18-volt power tools (such as reciprocating saws), pneumatic or hydraulic pipe-cutters, or oxy-acetylene gas cutting torches and automotive tools (floor jack and jack stands), and their theft can be completed within a few minutes.  Additionally, catalytic converters often lack unique serial numbers, VIN information, or other distinctive identification features, which creates evidentiary difficulties for law enforcement attempting to tie an individual stolen catalytic converter to its lawful owner.  Thus, catalytic converter theft has become increasingly popular because of their value, relative ease to steal, and their lack of identifying markings.

12.     Catalytic converter thieves are well informed of the makes and models of vehicles containing the most precious metals.  The thieves typically will obtain pricing information from an online pricing application.  Catalytic converter thieves (often caller "cutters") will often conduct searches in residential neighborhoods, parking lots, and other locations to steal the most high-value catalytic converters.

13.     Catalytic converter theft has become a nationwide problem across a multitude of state, local, and federal jurisdictions.  The theft of a vehicle's catalytic converter results in damage that renders the vehicle inoperable to the victim until properly replaced.  Not only are the vehicles

often mechanically unable to be driven, but they are also not legally operable under EPA regulations until repaired. The costs of repair are dependent upon the vehicle but are generally in excess of one thousand dollars.

14.     The process to remove the precious metals from the catalytic converters is complex and may release toxic gases. Therefore, catalytic converters are sold intact to an extraction company. The extraction company will remove the core from the catalytic converter using a "de-caning" process. The resulting precious metal powders are then sold to a metal refinery for further processing.

15.     Local law enforcement has noticed a rise in catalytic convert theft across Virginia, North Carolina, and throughout the United States.

16.     The FBI is investigating PAPOULOGLOU, as well as other subjects, Troy Hux ("Hux") and James Lynch ("Lynch"), and other unknown co-conspirators, for possible violations of interstate transportation of stolen goods. In the summer of 2021, the Federal Bureau of Investigation Richmond Field Office initiated an investigation into PAPOULOGLOU and other potential co-conspirators concerning the theft of catalytic converters and their transportation across state lines. The investigation revealed that PAPOULOGLOU, through his companies, STRATEGIC CONVERTER & CORES LLC and DG AUTO SOUTH LLC, purchased large numbers of catalytic converters, almost exclusively with U.S. currency, from thieves who steal the catalytic converters from victims' vehicles throughout the Southside region of Virginia and the Northeast region of North Carolina. DG AUTO SOUTH LLC then sold and sent the stolen converters to DG AUTO PARTS LLC, a company operating in New Jersey, for processing. In return, DG AUTO PARTS LLC sent large wire transfers into bank accounts in the name of STRATEGIC CONVERTER & CORES LLC and DG AUTO SOUTH LLC.

*The Purchase of Catalytic Converters Under Virginia Law and Purchase Records*

17.     From in or about at least 2014, and continuing through July 1, 2022, Section 59.1-136.3(B) of the Virginia Code has required purchasers of catalytic converters from individuals who are not affiliated with a licensed scrap seller to either: (1) receive documentation from the person selling the catalytic converter establishing the person's lawful possession of the catalytic converter (*e.g.*, bill of sale, receipt, letter of authorization, or similar evidence); or (2) document a "diligent inquiry" into whether the seller of the catalytic converter had a legal right to do so and submit to the local law enforcement a report describing the catalytic converter with the seller's identifying information.  Section 59.1-136.3(C) of the Virginia Code also required scrap metal purchasers to take a picture or video of these purchased catalytic converters and maintain such files for at least 30 days, to be provided to law enforcement if requested.  Based on my knowledge and experience, such files are expected to be stored on electronic media of catalytic converter purchasers, such as PAPOULOGLOU (including possibly on ELECTRONIC DEVICES);  the absence of such files can also constitute evidence of criminal activity.

18.     In response to rising catalytic converter thefts, Virginia passed a law taking effect on July 1, 2022 tightening the requirements on scrap metal purchasers of catalytic converters. Pursuant to section § 59.1-136.3(E) of the Virginia Code, starting on July 1, 2022, scrap metal purchasers of catalytic converters from individuals who are not affiliated with a licensed scrap seller must: (1) receive documentation from the seller of the catalytic converter establishing the seller's lawful possession of the catalytic converter (*e.g.*, bill of sale, receipt, letter of authorization, or similar evidence); (2) document a "diligent inquiry" into whether the seller of the catalytic converter had a legal right to do so and submit to the local law enforcement a report describing the catalytic converter with the seller's identifying information; and (3) maintain all such documentation for at

least 2 years after purchase, to be made available to law enforcement if requested.  Virginia law also still requires scrap metal purchasers to take a picture or video of these purchased catalytic converters and maintain such pictures for at least 30 days, to be provided to law enforcement if requested.  Based on my knowledge and experience, such files are expected to be stored on electronic media of catalytic converter purchasers, such as PAPOULOGLOU (including possibly on ELECTRONIC DEVICES);  the absence of such files can also constitute evidence of criminal activity.

19.    To comply with the statutory requirements to submit to local law enforcement a report describing the catalytic converter with the seller's identifying information, scrap metal purchasers in the greater Richmond, Virginia area made entries associated with each sale into a web-based database maintained by LeadsOnline LLC.  Such entries – submitted to LeadsOnline LLC ("LeadsOnline") either directly or via submittals of information through local law enforcement – documented for each catalytic converter sale the name of the seller, transaction date, and purchase price among other information.

20.    On or about July 25, 2022, law enforcement received records from LeadsOnline as it pertained to PAPOULOGLOU and his business located at the BUSINESS PREMISES.  The LeadsOnline records spanned from when LeadsOnline first received a reported transaction from PAPOULOGLOU on December 1, 2020 through to July 18, 2022.  The records revealed DG AUTO SOUTH LLC has purchased approximately $5.4 million worth of items during the aforementioned time period.  Of the approximate $5.4 million worth of purchases, about 97 percent of the purchases were catalytic converters (i.e., $5.3 million).  Based on my knowledge and experience, electronic records associated with such transactions are expected to be stored on electronic media of catalytic

converter purchasers, such as PAPOULOGLOU (including possibly on ELECTRONIC DEVICES);  the absence of such files can also constitute evidence of criminal activity.

*Law Enforcement Visit to BUSINESS PREMISES*

21.     On May 5, 2021, the Greensville County Sheriff's Office and the Brunswick County Sheriff's Office entered the business at the BUSINESS PREMISES.  PAPAOULOGLOU was in the garage area of the BUSINESS PREMISES.  Also in the garage, was Hux, Lynch, and Daniel Floyd ("Floyd").  Hux, Lynch, and Floyd were all standing around a pickup truck, which was backed into the garage, and the truck bed was full of catalytic converters.  PAPOULOGLOU told law enforcement the catalytic converters were from Gaston, North Carolina.  PAPOULOGLOU later told law enforcement that Hux worked for PAPOULOGLOU and the truck belonged to Floyd. A law enforcement officer asked PAPOULOGLOU, "You don't know where all them catalytic converts came from?"  PAPOULOGLOU responded, "They buy, they sh-, all they gotta do is show all their receipts, they ship, they shrunk a shit load of cars every week."  Law enforcement followed up and asked, "So they are all off the cars they bought?"  PAPOULOGLOU replied, "That's what they say."  Records recovered from LeadsOnline revealed that Hux sold 96 catalytic converters to DG AUTO SOUTH LLC on May 5, 2021 and was paid $32,772.

22.     On May 5, 2021, PAPOULOGLOU also showed law enforcement a machine that was in garage area of the BUSINESS PREMISES.  PAPOULOGLOU showed how the machine works and that it sucks the dust out of the catalytic converter and that the dust is valuable. PAPOULOGLOU stated, "We bought 10 of them, a quarter million dollars I spent." PAPOULOGLOU said, "I got more than one location, I got em, I, na I got em here, New Jersey, Wisconsin we got more than one location."  PAPOULOGLOU said he had to buy the machine to cut costs and remain competitive.  Law enforcement pointed out a picture hanging on a wall in

PAPOULOGLOU's building. PAPOULOGLOU said the people in the picture were his partners. PAPOULOGLOU explained they got PAPOULOGLOU out of debt in 2019. PAPOULOGLOU also stated the only way law enforcement can determine if a catalytic converter is a stolen one is if the thief does nothing to the converter, law enforcement recovers it, and law enforcement matches the cut marks on the catalytic converter to the cut marks on the vehicle. PAPOULOGLOU claimed his business was a million dollar a year business. PAPOULOGLOU said he was willing to cooperate with law enforcement and he stated, "Like I told the people in New Jersey, he says, we, we follow by the laws in New Jersey, we follow by the laws in Wisconsin. Wisconsin really ain't got no law, but here, you know, lets follow by the law got here." When PAPOULOGLOU and law enforcement are in his office, there was a surveillance system monitor displaying multiple camera views he had throughout his business. PAPOULOGLOU pointed to one of the camera views and told law enforcement he had a box of brand new catalytic converters that came from the factory. PAPOULOGLOU said he bought them from a dealership in September of 2020 for $7,800 and there are 20 catalytic converters in the box. PAPOULOGLOU said they were worth $50,000, at the time of the interview.

*May 9, 2021 Interview of Matthew Gay*

23.     On May 9, 2021, law enforcement interviewed Matthew Gay ("Gay") after he was arrested for his involvement in the theft of catalytic converters. Gay admitted his involvement in the theft of catalytic converters, and he named other people who have stolen catalytic converters when he was present. Gay talked about stealing catalytic converters in Northampton County, North Carolina. Gay stated he took his stolen catalytic converters to Brandon Reeves ("Reeves"). Gay stated that Reeves then took the stolen converters to "Stevie Pearson," who law enforcement knows as Carl Steve Pearson ("Pearson"). Gay stated he was present during these transactions and Pearson

was aware the catalytic converters were stolen because Pearson would ask if they were "hot" and Gay would answer him in the affirmative.  Based on my training and experience, "hot" is a slang term used to describe something is stolen.  Gay explained Pearson would then take the catalytic converters to PAPOULOGLOU.  Gay stated Pearson and Hux were selling catalytic converters to PAPOULOGLOU.

*Controlled Sales*

24.    On August 10, 2022, an individual hereafter referred to as Confidential Informant ("CI")-1 met with PAPOULOGLOU and James Lynch ("Lynch") in front of the BUSINESS PREMISES.  CI-1 told PAPOULOGLOU and Lynch there was a man from out of town, hereafter referred to as Undercover Employee ("UCE")-1, who wanted to sell some "hot" catalytic converters.  PAPOULOGLOU asked CI-1 to find out when UCE-1 wanted to sell the catalytic converters.  Lynch told CI-1 to find out when UCE-1 wanted to sell them "so we can get our bread together."  Based on my training and experience, "bread" is a slang term used to describe money.  CI-1 told PAPOULOGLOU and Lynch that UCE-1 and CI-1 had been selling the catalytic converters to Hux and Hux was taking a 25 percent cut because Hux knew they were "hot."  PAPOULOGLOU said Hux had to take the percentage because Hux was "taking a gamble."  PAPOULOGLOU said his "buddy" took a gamble and 20 minutes after the person left the "feds" "ran up in that place."  PAPOULOGLOU claimed the "feds" seized $1.2 million dollars in cash and 5,000 converters even though "only maybe 400 were stolen, the rest were good."  After PAPOULOGLOU told the story, PAPOULOGLOU still told CI-1 to let him know when CI-1 would be ready to sell.

25.    On August 24, 2022, FBI Richmond conducted an operation where purportedly stolen catalytic converters were sold to PAPOULOGLOU.  The FBI provided catalytic converters

to CI-1, who then transported them to the BUSINESS PREMISES. Lynch and PAPOULOGLOU were at the BUSINESS PREMISES. After bringing in the catalytic converters to the BUSINESS PREMISES, CI-1 told Lynch and PAPOULOGLOU that UCE-1 was going to bring about 75 catalytic converters to sell. CI-1 told Lynch and PAPOULOGLOU that CI-1 and UCE-1 had been selling the catalytic converters to Hux. CI-1 stated Hux knew the catalytic converters CI-1 was selling him were stolen. During the transaction, PAPOULOGLOU was utilizing a cellular device to grade the catalytic converters. PAPOULOGLOU stated he had programed the app on his device to take his "cut" out of the price he was giving to CI-1.

26.     Based on my knowledge of the investigation, PAPOULOGLOU was utilizing an application on his cellular device created by DG AUTO PARTS LLC – i.e., the DG Auto app. The application or "app" acts as a look-up tool to query the value of a catalytic converter. The user types in a "code" that is located on a catalytic converter and the programs informs the user the value. Since PAPOULOGLOU has direct ties to DG AUTO PARTS LLC, he is given administrative access to the application and can change the listed pricing of the catalytic converters to prospective catalytic converter sellers. This process of looking up the value of a catalytic converter is called "grading."

27.     CI-1 asked PAPOULOGLOU when it would be good for UCE-1 to come by and sell the catalytic converters. PAPOULOGLOU told CI-1 Monday [August 29] or Tuesday [August 30] of next week would be good days. CI-1 then told PAPOULOGLOU that UCE-1 was taking catalytic converters to another business but that owner was taking 50 percent off because he knew they were stolen. PAPOULOGLOU told CI-1 he would not take that much off the price. CI-1 continued and told PAPOULOGLOU UCE-1 stopped going to the other business and started to sell to Hux. CI-1 told PAPOULOGLOU that Hux was taking 25 percent off because Hux knew they

were "hot." PAPOULOGLOU told CI-1 he would take 25 percent off on the app when UCE-1 sells to PAPOULOGLOU.

28.     On August 29, 2022, CI-1 made a recorded phone call to 252-673-1158. PAPOULOGLOU answered the call and confirmed meeting on August 30, 2022 in the morning so CI-1 and UCE-1 can sell PAPOULOGLOU catalytic converters.

29.     On August 30, 2022, FBI Richmond conducted an operation where purportedly stolen catalytic converters were sold to PAPOULOGLOU. The FBI provided catalytic converters to UCE-1 and CI-1, who then drove them in a vehicle to the BUSINESS PREMISES. UCE-1 backed into the garage area of the business and UCE-1 and CI-1 were met by PAPOULOGLOU and Lynch. Lynch began reading off the codes to PAPOULOGLOU, who was grading the catalytic converters on his cellular device. During the time UCE-1 was in the presence of PAPOULOGLOU, PAPOULOGLOU received phone calls on his cellular device and spoke with someone. As such, it is believed that the cellular device PAPOULOGLOU utilized to grade and ultimately purchase the catalytic converters was the cellular device associated with 252-673-1158. It is further believed, PAPOULOGLOU has utilized the cellular device with 252-673-1158 to facilitate the purchases of catalytic converters (including those known or believed by him to be stolen). PAPOULOGLOU and UCE-1 discussed percentages, and PAPOULOGLOU told UCE-1 he has already taken his cut through the app. While grading the catalytic converters, UCE-1 talked about PAPOULOGLOU being "fair." UCE-1 told PAPOULOGLOU, "Man, you told me you were fair, man. That's, that's the problem man, once once folks find out they hot, man, they, they wanna try to…" PAPOULOGLOU interrupted and said, "Dude I was up, last year I was buying 3 to 4 thousand here a week." During the grading, PAPOULOGLOU was recording the prices on an electronic data pad. PAPOULOGLOU stated the data pad was totaling the values in case his phone "messed up." UCE-

1 asked PAPOULOGLOU, "What do you do when you break em down, that's what I don't know?" PAPOULOGLOU said he will show UCE-1 a bucket of how it looks and that "they get shipped to Japan." PAPOULOGLOU then stated, "I'm a still ship to Japan even through the company still gonna go to Japan." UCE-1 asked PAPOULOGLOU if PAPOULOGLOU was going to ship them out of Norfolk. PAPOULOGLOU answered, "New Jersey, New York." After the catalytic converters had been graded and the prices had been added up, PAPOULOGLOU went to an office in the BUSINESS PREMISES to procure some U.S. currency. PAPOULOGLOU opened a large, grey Cannon brand safe that was in the office. PAPOULOGLOU retrieved U.S. currency and began to run it through a money counter. UCE-1 was paid $16,130 for the catalytic converters that were presented to PAPOULOGLOU as being stolen.

30.     The FBI requested subscriber records for the 252-673-1158 phone number from the telephone service provider, T-Mobile US, Inc. Records as of August 5, 2022, revealed GEORGIA CANNON is the registered subscriber of 252-673-1158 and has been since May 16, 2022. The listed billing address for GEORGIA CANNON is the BUSINESS PREMISES. GEORGIA CANNON was also the subscriber from July 19, 2012 up to May 16, 2022. During that time period, the billing address was listed as 713 Scott Street, Gaston, North Carolina 27832 (an address associated with PAPOULOGLOU via state records). Notably, the laptop described in Attachment A-7 has "Georgia Cannon" markings.

31.     Based on the aforementioned facts, it is believed that PAPOULOGLOU utilizes a cellular device with the 252-673-1158 phone number.

*June 16, 2022 Interview with Carol Reaves*

32.     On June 16, 2022, law enforcement interviewed Carol Reaves ("Reaves") about her involvement in the theft of catalytic converters. Reaves confessed to transporting Ryan Nathaniel

Medlin ("Medlin") around while he stole catalytic converters. Reaves estimated Medlin stole over 1,000 catalytic converters. Reaves stated her and Medlin were stealing catalytic converters day and night for about 1 year. Medlin was also stealing catalytic converters with his cousin, Ryan Paul Medlin ("RPM"). Reaves stated Medlin mostly stole catalytic converters in Brunswick County, Virginia and Greensville County, Virginia. Medlin also stole catalytic converters in Warren County, North Carolina, Halifax County, North Carolina and Northampton County, North Carolina. Reaves stated Medlin sold the stolen catalytic converters to PAPOULOGLOU and Hux. Reaves and Medlin were taking 10 to 20 to PAPOULOGLOU at a time. Reaves stated she would use her ID when they sold the catalytic converters to PAPOULOUGLOU at his business. Reaves stated PAPOULOGLOU would give her a printed receipt. Reaves stated PAPOULOGLOU knew they were stolen because Reaves heard Medlin tell PAPOULOGLOU they were "not legit." PAPOULOGLOU told Medlin if the catalytic converters were "not legit" to, next time, bring them to his house, which was located in Roanoke Rapids, North Carolina. Reaves stated she and Medlin did not take catalytic converters to PAPOULOGLOU's house because PAPOULOGLOU told Medlin to take them to his associate, Hux. Reaves and Medlin then took their stolen catalytic converters to Hux's house in North Carolina. Reaves said she always went with Medlin when he sold catalytic converters to Hux. Reaves said Hux knew the catalytic converters were stolen because Hux would scout the area and tell Medlin and others where high value catalytic converters were located. Reaves stated Medlin would look up the prices of the catalytic converters on the DG Auto app before they took them to Hux. Medlin would then screen shot the app and send the screen shot to Hux. Reaves explained this was done so Hux would have the money ready when Medlin and Reaves went to Hux's house to drop off the stolen catalytic converters. Reaves stated Hux took 20 percent off of the price of the catalytic converter because Hux knew they were stolen. Reaves said

Medlin was okay with Hux keeping 20 percent because the catalytic converters were stolen.  Reaves estimated she and Medlin were receiving between $500 to $1,500 a day from Hux for a year for the catalytic converters they sold to Hux.

33.    The LeadsOnline records revealed that Reaves sold $10,403 worth of catalytic converters to DG AUTO SOUTH LLC.

*Surveillance at the SUBJECT PREMISES and State Records for the SUBJECT PREMISES*

34.    In the morning of October 12, 2022, law enforcement observed PAPOULOGLOU leave the SUBJECT PREMISES in a Chevrolet Suburban with North Carolina license plate THP8335.  A license plate query through the NCDMV revealed the vehicle is registered to PAPOULOLGOU.  PAPOULOGLOU stopped at two locations in the area before proceeding to the BUSINESS PREMISES.  PAPOULOGLOU parked the Suburban at the BUSINESS PREMISES. Individuals at BUSINESS PREMISES unloaded catalytic converters from the Suburban and took them into the garage area of the BUSINESS PREMISES.  At each location PAPOULOGLOU stopped at before proceeding to the BUSINESS PREMISES, nothing was loaded into the Suburban, which means the catalytic converters were in the Suburban when PAPOULOGLOU left the SUBJECT PREMISES.

35.    On October 14, 2022, law enforcement observed a black colored hitch trailer with a wooden box like structure enclosing the bed of the trailer on the BUSINESS PREMISES.  This trailer is believed to be the same trailer that was observed on the Facebook profile "Nick Emporia Recycling."

36.    On October 13, 2022, law enforcement observed PAPOULOGLOU leave the SUBJECT PREMISES in the morning and travel to the BUSINESS PREMISES.

37.     On October 13, 2022, the SUBJECT PREMISES was queried through the Halifax County, North Carolina website.  Online records for Halifax County, North Carolina revealed the SUBJECT PREMISES was owned by THEODORE PAPOULOGLOU.  Records also revealed the SUBJECT PREMISES was bought on January 19, 2021.

*Search and Seizure of ELECTRONIC DEVICES*

38.     On May 5, 2021, PAPOULOGLOU told law enforcement he had 6 cameras on his house.  Since, PAPOULOGLOU is known to use video surveillance at his residence, which is likely to have recorded his transactions involving catalytic converters; such surveillance evidence is likely to be stored on the ELECTRONIC DEVICES.

39.     During the FBI operations on August 24, 2022 and August 30, 2022, PAPOULOGLOU utilized a cellular device to grade the catalytic converters.  On August 30, 2022, PAPOULOGLOU also utilized an electronic data tablet to record the prices of the catalytic converters.  Additionally, on August 29, 2022 PAPOULOGLOU utilized a cellular communication device to talk with CI-1.  Cellular devices and electronic data tablets are easily transportable, and such data can easily be moved to other storage media.  It is reasonable to believe PAPOULOGLOU would maintain possession the cellular devices and electronic data tablets.  In my experience, most people maintain possession of their cellular devices and if they do not, it normally is in very close proximity to them.  On November 2, 2022, the FBI seized four total cellular communication devices from the SUBJECT PREMISES, two of them were in reaching distance to PAPOULOGLOU's bed.

40.     An internet search, as of October 14, 2022, revealed several Facebook profiles that have a picture PAPOULOGLOU and a picture of catalytic converters on the main page.  One of the Facebook profile names is "Nick Emporia Recycling."  On October 26, 2022, the user of the account posted "Left Monday 12pm done 1700miles in 59 hours back home relaxing until the next trip"

18

along with a photo of catalytic converters in what appeared to be a black metal open trailer with a wooden enclosure on top of it.  It is believed PAPOULOGLOU maintains these Facebook profiles. Such photos were likely captured and/or stored using ELECTRONIC DEVICES.

41.     Because PAPOULOGLOU utilizes ELECTRONIC DEVICES in one form or another, there is probable cause to believe that evidence of violations of 18 U.S.C. § 2314 and 18 U.S.C. § 371, will be found on the ELECTRONIC DEVICES seized from the SUBJECT PREMISES.  Thus, the warrant applied for would authorize the search and seizure of electronic devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

## TECHNICAL TERMS

42.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Cellular Device:  A cellular device is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A cellular device usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Cellular

19

devices may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

43.     Based on my knowledge, training, and experience, I know that ELECTRONIC DEVICES can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

44.     There is probable cause to believe that things that were once stored on the ELECTRONIC DEVICES may still be stored there, for at least the following reasons:

  a.  Based on my knowledge, training, and experience, I know that computer files, telephone files, or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

45.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the ELECTRONIC DEVICES were used, the purpose of use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the ELECTRONIC DEVICES because:

e.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

f.   Forensic evidence on ELECTRONIC DEVICES can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

g.   A person with appropriate familiarity with how ELECTRONIC DEVICES work may, after examining this forensic evidence in its proper context, be able to draw conclusions about how ELECTRONIC DEVICES were used, the purpose of their use, who used them, and when.

h.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

46.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the ELECTRONIC DEVICES consistent with the warrants.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might

23

expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

47.    *Manner of execution.*   Because this warrant seeks only permission to examine ELECTRONIC DEVICES already in law enforcement's possession, the execution of these warrants do not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## CONCLUSION

48.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the ELECTRONIC DEVICES described in Attachment A to seek the items described in Attachment B.

49.    Based upon the foregoing, I request that this Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, to authorize the examination of the ELECTRONIC DEVICES described in Attachments A-1 through A-12 for the items described in Attachment B.

David Vallario
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me on November ____18____, 2022  by telephone.

/s/  MRC

THE HONORABLE MARK R. COLOMBELL
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No. 3:22-sw-___ |
| SAMSUNG GALAXY S22 ULTRA BEARING SERIAL NUMBER R5CRC3X5HAE | **FILED UNDER SEAL** |
| CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | |

**ATTACHMENT A-1**

**DESCRIPTION OF DEVICE TO BE SEARCHED**

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

SAMSUNG GALAXY S22 ULTRA BEARING SERIAL NUMBER R5CRC3X5HAE;

The above-mentioned device was seized from a night stand next to a bed in a room labelled "J" by the FBI.  The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>SAMSUNG GALAXY S21 ULTRA BEARING SERIAL NUMBER R5CRC3X5Z5M<br><br>CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

## ATTACHMENT A-2

### DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

SAMSUNG GALAXY S21 ULTRA BEARING SERIAL NUMBER R5CRC3X5Z5M

The above-mentioned device was seized from a night stand next to a bed in a room labelled "J" by the FBI.  The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>AMCREST DIGITAL VIDEO RECORDER (DVR) BEARING SERIAL NUMBER AMR1454328C5221A37<br><br>CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

## ATTACHMENT A-3

### DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

AMCREST DIGITAL VIDEO RECORDER (DVR) BEARING SERIAL NUMBER
AMR1454328C5221A37

The above-mentioned device was seized from a bookshelf in a room labeled "N" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No. 3:22-sw-____ |
| AMCREST DIGITAL VIDEO RECORDER (DVR) BEARING SERIAL NUMBER AMR1454E966934A0BD | **FILED UNDER SEAL** |
| CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | |

**ATTACHMENT A-4**

**DESCRIPTION OF DEVICE TO BE SEARCHED**

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

AMCREST DIGITAL VIDEO RECORDER (DVR) BEARING SERIAL NUMBER
AMR1454E966934A0BD

The above-mentioned device was seized from a room labeled "Q" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>TOSHIBA LAPTOP COMPUTER BEARING SERIAL NUMBER 8A413556Q<br><br>CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

## ATTACHMENT A-5

## DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

TOSHIBA LAPTOP COMPUTER BEARING SERIAL NUMBER 8A413556Q

The above-mentioned device was seized from a room labeled "C" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>TOSHIBA LAPTOP COMPUTER BEARING SERIAL NUMBER 584034-001<br><br>CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

**ATTACHMENT A-6**

**DESCRIPTION OF DEVICE TO BE SEARCHED**

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

TOSHIBA LAPTOP COMPUTER BEARING SERIAL NUMBER 584034-001

The above-mentioned device was seized from a room labeled "C" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:

BLACK HP LAPTOP WITH OBLITERATED
MODEL AND SERIAL NUMBER WITH A
LABEL "GEORGIA CANNON"

CURRENTLY LOCATED AT THE FEDERAL
BUREAU OF INVESTIGATION EVIDENCE
CONTROL ROOM AT 1970 E. PARHAM RD.
RICHMOND, VA 23228.

Case No. 3:22-sw-___

**FILED UNDER SEAL**

## ATTACHMENT A-7

## DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

BLACK HP LAPTOP WITH OBLITERATED MODEL AND SERIAL NUMBER WITH A
LABEL "GEORGIA CANNON"

The above-mentioned device was seized from a room labeled "N" by the FBI.  The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCH OF:

SAMSUNG MODEL SPH-L900 WITH IMEI
NUMBER 99000211920997

CURRENTLY LOCATED AT THE FEDERAL
BUREAU OF INVESTIGATION EVIDENCE
CONTROL ROOM AT 1970 E. PARHAM RD.
RICHMOND, VA 23228.

Case No. 3:22-sw-___

**FILED UNDER SEAL**

**ATTACHMENT A-8**

**DESCRIPTION OF DEVICE TO BE SEARCHED**

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

SAMSUNG MODEL SPH-L900 WITH IMEI NUMBER 99000211920997

The above-mentioned device was seized from a bedside table drawer in room labeled "H" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>SAMSUNG GALAXY NOTE 8 BEARING<br>SERIAL NUMBER 358503087250917<br><br>CURRENTLY LOCATED AT THE FEDERAL<br>BUREAU OF INVESTIGATION EVIDENCE<br>CONTROL ROOM AT 1970 E. PARHAM RD.<br>RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

## ATTACHMENT A-9

## DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

SAMSUNG GALAXY NOTE 8 BEARING SERIAL NUMBER 358503087250917

The above-mentioned device was seized from the bottom drawer of a small file cabinet in a room labeled "H" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>HP COMPUTER TOWER BEARING SERIAL NUMBER 3CR2241D4B<br><br>CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

## ATTACHMENT A-10

## DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

HP COMPUTER TOWER BEARING SERIAL NUMBER 3CR2241D4B

The above-mentioned device was seized from an office desk in a room labeled "H" by the FBI.  The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>IN WIN COMPUTER TOWER BEARING BARCODE 40001000209878 AND A LABEL OF "CYBERTRONPC"<br><br>CURRENTLY LOCATED AT THE FEDERAL BUREAU OF INVESTIGATION EVIDENCE CONTROL ROOM AT 1970 E. PARHAM RD. RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

## ATTACHMENT A-11

### DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

IN WIN COMPUTER TOWER BEARING BARCODE 40001000209878 AND A LABEL OF "CYBERTRONPC"

The above-mentioned device was seized from on top of a filing cabinet in a room labeled "H" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>DIGITAL VIDEO RECORDER BEARING<br>SERIAL NUMBER 28429061504545<br><br>CURRENTLY LOCATED AT THE FEDERAL<br>BUREAU OF INVESTIGATION EVIDENCE<br>CONTROL ROOM AT 1970 E. PARHAM RD.<br>RICHMOND, VA 23228. | Case No. 3:22-sw-___<br><br>**FILED UNDER SEAL** |

## ATTACHMENT A-12

### DESCRIPTION OF DEVICE TO BE SEARCHED

This Warrant authorizes the forensic examination of the following electronic device seized from 509 Maple Street, Roanoke Rapids, North Carolina 27870 on November 2, 2022 by the Federal Bureau of Investigation for the purpose of identifying the electronically stored information described in Attachment B:

DIGITAL VIDEO RECORDER BEARING SERIAL NUMBER 28429061504545

The above-mentioned device was seized from a room labeled "O" by the FBI. The above-mentioned electronic device is currently secured at the Federal Bureau of Investigation Richmond Division Evidence Control Room, 1970 E. Parham Road, Richmond, Virginia 23228.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEARCHES OF:

SAMSUNG GALAXY S22 ULTRA BEARING
SERIAL NUMBER R5CRC3X5HAE;

SAMSUNG GALAXY S21 ULTRA BEARING
SERIAL NUMBER R5CRC3X5Z5M;

AMCREST DIGITAL VIDEO RECORDER
(DVR) BEARING SERIAL NUMBER
AMR1454328C5221A37;

AMCREST DIGITAL VIDEO RECORDER
(DVR) BEARING SERIAL NUMBER
AMR1454E966934A0BD;

TOSHIBA LAPTOP COMPUTER BEARING
SERIAL NUMBER 8A413556Q;

TOSHIBA LAPTOP COMPUTER BEARING
SERIAL NUMBER 584034-001;

BLACK HP LAPTOP WITH OBLITERATED
MODEL AND SERIAL NUMBER WITH A
LABEL "GEORGIA CANNON";

SAMSUNG MODEL SPH-L900 WITH IMEI
NUMBER 99000211920997;

SAMSUNG GALAXY NOTE 8 BEARING
SERIAL NUMBER 358503087250917;

HP COMPUTER TOWER BEARING SERIAL
NUMBER 3CR2241D4B;

IN WIN COMPUTER TOWER BEARING
BARCODE 40001000209878 AND A LABEL
OF "CYBERTRONPC"; and

DIGITAL VIDEO RECORDER BEARING
SERIAL NUMBER 28429061504545

Case No. 3:22-sw-

*through*

Case No. 3:22-sw-

**FILED UNDER SEAL**

ALL CURRENTLY LOCATED AT THE
FEDERAL BUREAU OF INVESTIGATION
EVIDENCE CONTROL ROOM AT 1970 E.
PARHAM RD. RICHMOND, VA 23228.

## ATTACHMENT B

## ELECTRONIC DEVICES TO BE SEIZED AND IMAGED

The digital items to be seized and imaged (described in Attachments A-1 through A-12 and referred here collectively as "ELECTRONIC DEVICES") contain evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"): Title 18, U.S.C. §§ 2314 (interstate transportation of stolen property) and 371 (conspiracy to commit interstate transportation of stolen property):

1. Financial records of DG AUTO SOUTH LLC, STRATEGIC CONVERTER AND CORES LLC, and/or THEODORE PAPOULOGLOU, including but not limited to: (1) bank records; (2) records related to checks, credit card bills, wire transfers, virtual currency, and virtual currency transactions; (3) tax information and returns; (4) employment records; (5) records of assets; (6) financial account information; and (7) safe deposit information and safe deposit keys.

2. All information, records, and communications relating to catalytic converters, including information, records, and communications related to: purchases, sales, shipments, contacts, "cutters"/thieves, pricing, grading, the catalytic converter "decanning" process, transportation, customers, payables, receivables, pay/owe sheets, loans, financing, images and videos of catalytic converters, equipment used to process catalytic converters, reports to law enforcement, reports to LeadsOnline, and the DG Auto App.

3. Records and communications related to DG AUTO PARTS LLC, including those reflecting shipments and financial transactions.

4. Indicia of, occupancy, residency, and ownership or control of the properties owned by DG AUTO SOUTH LLC, STRATEGIC CONVERTER AND CORES LLC, and/or THEODORE PAPOULOGLOU, including but not limited to: (1) utility and telephone bills; (2) cancelled envelopes; (3) rental, purchase, or lease agreements; (4) identification documents; and (5) mail.

5. Records of all assets owned or controlled by DG AUTO SOUTH LLC, STRATEGIC CONVERTER AND CORES LLC, and/or THEODORE PAPOULOGLOU.

6. Employee records of DG AUTO SOUTH LLC and/or STRATEGIC CONVERTER AND CORES LLC.

7. Evidence of the purchase of items with money derived from the sale of catalytic converters, including but not limited to the item, receipts, and bills of sale.

8. Shipping records, including but not limited to: (1) records tending to identify the methods or persons involved in storing and transporting catalytic converters; (2) records relating to bulk mail points of contact; and (3) records relating to shipping companies, rental car companies, and freight transport companies.

9. Records and communications related to: (1) stealing, shipping, and/or grading catalytic converters; and (2) evading law enforcement detection.

10. Records, items, and documents reflecting travel to the New Jersey or New York areas, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps, and written directions.

11. General ledger for DG AUTO SOUTH LLC and STRATEGIC CONVERTER AND CORES LLC.

12. Records of video surveillance and associated video surveillance equipment.

Evidence of user attribution showing who used or owned the ELECTRONIC DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized materials, that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e. communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that

are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. This investigation is presently covert and the government believes that the subject of the search is not aware of this warrant.